**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW MEXICO**

NEW MEXICO WILDLIFE FEDERATION,
BATTALION SEARCH AND RESCUE,
and SOUTHERN BORDER
COMMUNITIES COALITION,

Plaintiffs,

v.

U.S. DEPARTMENT OF THE INTERIOR,
DOUG BURGUM, in his Official Capacity as
U.S. Secretary of the Interior, U.S.
DEPARTMENT OF DEFENSE,
PETE HEGSETH, in his Official Capacity as
U.S. Secretary of Defense,
U.S. DEPARTMENT OF THE ARMY,
and ADAM TELLE, in his Official Capacity
as Acting Secretary of the Army,

Defendants.

Case No. __-cv-________

**COMPLAINT AND PETITION FOR REVIEW OF AGENCY ACTION**

## INTRODUCTION

1. This lawsuit challenges the Trump-Vance administration's unlawful transformation of tens of thousands of acres of public land along the southern border into a de facto military installation for the express but impermissible purpose of facilitating the military's participation in civilian law enforcement. By creating a so-called "national defense area," a Department of Defense ("DoD") designation that before 2025 was only used to temporarily secure the immediate perimeter of a discrete emergency such as a military aircraft crash, the administration has militarized wide swaths of public land in New Mexico.[1] In so doing, the administration has significantly disrupted life along the U.S. southern border, barring New Mexico residents from accessing traditionally public land that was long used as part of everyday life and causing ongoing harm to organizations' and individuals' recreational, humanitarian, and civic interests.

2. Specifically, in April 2025, the U.S. Department of the Interior transferred jurisdiction to DoD of at least 100,000 acres of public land along the New Mexico-Mexico border. Interior did so for the explicit purpose of allowing DoD to thereafter deem that land a "national defense area," a designation that has allowed DoD not only to prevent the public from accessing the land, but also to evade the restrictions of the Posse Comitatus Act, which was enacted in 1878 to prohibit military personnel from engaging in civilian law enforcement, including assisting in the enforcement of immigration laws.

3. As an initial matter, Interior lacked authority to transfer the New Mexico land to DoD under the emergency withdrawal authorization that the agency invoked. To authorize an immediate emergency withdrawal, Interior needed to find that the transfer would further the protection of environmental values; instead, Interior was explicit that the transfer was intended to

---

[1] Because "by statute," the agency remains named the "Department of Defense," this lawsuit refers to the agency by its Congressionally mandated name. *Fuselier v. Riscassi*, No. 25-268, 2026 WL 1195821, at *1 n.1 (S.D. Miss. May 1, 2026) (citing 5 U.S.C. § 101).

further the administration's immigration enforcement agenda. Accordingly, Interior unlawfully effected an immediate transfer of the land without following the normal withdrawal process. Interior's transfer was thus contrary to law and substantively and procedurally arbitrary and capricious.

4. DoD also lacked authority to create the "national defense area." No statute authorizes the creation of "national defense areas," let alone permits carving one out of formerly public land. And the scale, scope, and purpose of the New Mexico defense area—a semi-permanent designation stretching over more than a hundred thousand acres for the explicit purpose of allowing military personnel to engage in civilian law enforcement—far exceeds even the most generous interpretation of any authority Congress has granted to DoD. DoD's creation of the "national defense area" therefore exceeds the agency's statutory authority, is contrary to law, and is unlawful under the major questions doctrine.

5. Even if the concept of a "national defense area" were permitted in certain circumstances, DoD's creation of one for the reasons and under the conditions present here is unlawful. The agency's own regulations and guidance explain that "national defense areas" are, at most, temporary and ad-hoc measures intended to be used in the immediate aftermath of an accident or emergency to allow DoD personnel to secure the area to protect property and bystanders. Creating a semi-permanent military zone along the southern border for purposes of immigration enforcement is directly contrary to the agency's longstanding practice. Thus, DoD's creation of the "national defense area" was contrary to law and substantively and procedurally arbitrary and capricious.

6. Finally, and as an independent legal violation, DoD's expenditure of funds appropriated in the One Big Beautiful Bill Act ("OBBBA") for immigration enforcement and border militarization in this unlawfully created "national defense area" violates the Constitution's

Army Clause, which requires that funds for the Army be appropriated every two years, rather than the four-year term provided for in that Act.

7. The agencies' actions are causing Plaintiffs ongoing harm. Plaintiff New Mexico Wildlife Federation's members cannot access what was once public land to recreate, including to hunt, hike, and birdwatch. And those members also cannot observe ongoing ranching and grazing activities occurring within that land to ensure the Bureau of Land Management is adhering to its Congressionally required land management commitments. Plaintiff Battalion Search and Rescue can no longer access land critical to the organization's humanitarian mission, including providing aid to migrants, and locating the remains of deceased migrants so that they can be identified and the migrants' families notified before those remains deteriorate. And Plaintiff Southern Border Communities Coalition and its members are impaired in their ability to provide services to communities along the border, including by virtue of the physical disruption that has been caused by the creation of an active military zone on public land.

8. The Court should accordingly declare Interior and DoD's actions unlawful, vacate Interior's order transferring jurisdiction of the land to DoD and DoD's orders deeming the land a "national defense area," and declare unlawful and enjoin further obligations or expenditures by the Army of funds appropriated in the OBBBA for use creating or maintaining the "national defense area" in New Mexico.

## PARTIES

9. Plaintiff New Mexico Wildlife Federation ("NMWF") is a 501(c)(3) nonprofit organization headquartered in Albuquerque, New Mexico and established in 1914. For over 110 years, NMWF's mission has been to ensure that New Mexico's public lands, waters, wildlife, and resources are managed equitably and with respect for the State's cultural, hunting, fishing, and

recreational traditions. NMWF is a membership organization and brings this action on behalf of itself and its members.

10. Plaintiff Battalion Search and Rescue ("BSAR") is a 501(c)(3) nonprofit organization headquartered in Arizona, with an office in New Mexico. BSAR was established in 2020 and is an all-unpaid-volunteer humanitarian search organization with the mission of searching for missing migrants who have disappeared in remote areas along the American southwest border, including in areas now covered by the New Mexico "national defense area." BSAR focuses on saving lives by finding people in distress and diligently searching for the remains of the fallen so that families can be notified and conduct a proper burial.

11. Plaintiff Southern Border Communities Coalition ("SBCC") is a project of Alliance San Diego, a 501(c)(3) nonprofit organization based in San Diego, California. SBCC comprises over 60 member organizations spanning the entire length of the U.S.-Mexico border, including California, Arizona, New Mexico, and Texas. Its members include environmental, faith-based, human rights, direct service, immigrant rights, and labor organizations. All SBCC member organizations are located, or serve a constituency, within 100 miles of the U.S.-Mexico border. SBCC's mission is to: (1) advocate for federal policy reform; (2) advocate for border enforcement policies and practices that are fair and respect human dignity and human rights; and (3) prevent the loss of life in the border region. Further, SBCC promotes policies and solutions that improve the quality of life in border communities, advances a positive image of the border region, and supports rational and humane immigration reform policies affecting the border region.

12. Defendant Interior is an agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551(1), 701(b)(1), and is headquartered in Washington, D.C.

13. Defendant Doug Burgum is the Secretary of the Interior, and is sued in his official capacity.

14. Defendant DoD is an agency within the meaning of the APA, 5 U.S.C. §§ 551(1), 701(b)(1), which is headquartered in Arlington, Virginia.

15. Defendant the U.S. Department of the Army is an agency within the meaning of the APA, 5 U.S.C. §§ 551(1), 701(b)(1), which is headquartered in Arlington, Virginia.

16. Defendant Pete Hegseth is the Secretary of Defense, and is sued in his official capacity.

17. Defendant Adam Telle is the Acting Secretary of the Army, and is sued in his official capacity.[2]

## JURISDICTION

18. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331. This action arises under the APA, 5 U.S.C. § 551, *et seq*., as well as the U.S. Constitution. This Court may grant declaratory relief, injunctive relief, and any other appropriate relief under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705-06.

## VENUE

19. Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(B), and (C) because at least one Plaintiff resides in this District and a substantial part of the events and omissions giving rise to the claims occurred in this District.

## LEGAL BACKGROUND

### I. Statutory Restrictions on the Withdrawal or Transfer of Public Lands.

20. The Property Clause of the Constitution provides Congress with the "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2.

---

[2] Defendants DoD, Army, Hegseth, and Telle are referred to throughout as "the DoD Defendants."

21. Thus, the Supreme Court has "repeatedly observed that '(t)he power over the public land thus entrusted to Congress is without limitations.'" *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976) (citation omitted); *see also Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1276 (10th Cir. 2017) (noting Congress's "broad, plenary Property Clause powers").

22. Pursuant to its Property Clause authority, Congress has enacted various provisions governing the use of public land. As relevant here, two provisions restrict federal agencies from withdrawing public land from normal use.

23. First, what is known as the "Engle Act" (now codified at 43 U.S.C. §§ 155-58), limits the withdrawal of public land for military purposes. Pub. L. No. 85-337, 72 Stat. 27 (Feb. 28, 1958).

24. "[E]xcept in time of war or national emergency," the Act imposes restrictions on "the withdrawal and reservation for, restriction of, and utilization by, the Department of Defense" "of the public lands of the United States" "for defense purposes." 43 U.S.C. § 155. An Act of Congress is therefore typically needed to withdraw over 5,000 acres of land for defense purposes. 43 U.S.C. § 156.

25. In the ordinary course, the requesting agency would send an application for withdrawal or restriction to Congress, including information such as the location and size of the requested withdrawal, the purpose of the withdrawal, whether use by DoD would result in contamination, the proposed period of withdrawal, and whether the withdrawal would impact the operation of various public land and conservation laws and regulations. 43 U.S.C. § 157.[3]

[3] Under regulations promulgated by Interior in 1981, the agency is responsible for "process[ing] applications for national defense withdrawals" by DoD pursuant to the Engle Act. 43 C.F.R. § 2300.0-3(a)(3).

26. However, as described further below, in April 2025 President Trump purported to waive the requirements of the Engle Act by virtue of his declaration of a national emergency at the southern border.

27. Second, the Federal Land Policy and Management Act ("FLPMA") "contains comprehensive inventorying and land use planning provisions" and "prescribe[s] management standards for the [Bureau of Land Management within the Department of Interior]." *Rocky Mtn. Oil and Gas Ass'n v. Watt*, 696 F.2d 734, 739 (10th Cir. 1982).

28. Among other things, FLPMA establishes restrictions on Interior's ability to withdraw land from public use. 43 U.S.C. § 1714(a).

29. A withdrawal for purposes of FLPMA "means withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program; or transferring jurisdiction over an area of Federal land . . . from one department, bureau or agency to another department, bureau or agency." 43 U.S.C. § 1702(j).

30. A withdrawal may only be "promulgated after an opportunity for a public hearing." 43 U.S.C. § 1714(h); *see also* 43 U.S.C. § 1714(b)(1) (requiring notice to be published in the Federal Register).

31. Further, an applicant agency must submit a detailed application to Interior providing "information, studies, analyses and reports" on a variety of topics, *see* 43 C.F.R. § 2310.3-2(a), including "[a]n environmental assessment, an environmental impact statement or any other documents as are needed to meet the requirements of the National Environmental Policy Act." 43 C.F.R. § 2310.3-2(b)(3).

32. "[A] withdrawal aggregating five thousand acres or more may be made . . . only for a period of not more than twenty years by the Secretary [of the Interior] on his own motion or upon request by a department or agency head." 43 U.S.C. § 1714(c)(1). "The Secretary shall notify both Houses of Congress of such a withdrawal no later than its effective date and the withdrawal shall terminate and become ineffective at the end of ninety days . . . if the Congress has adopted a concurrent resolution stating that such House does not approve the withdrawal." *Id.*

33. Along with providing for Congressional notice and a public hearing, Interior is also required to submit a report to the relevant Congressional committees providing, among other things, "a clear explanation of the proposed use of the land involved which led to the withdrawal," "an inventory and evaluation of the current natural resource uses and values of the site and adjacent public and nonpublic land and how it appears they will be affected by the proposed use," "an identification of present users of the land involved, and how they will be affected by the proposed use," "an analysis of the manner in which existing and potential resource uses are incompatible with or in conflict with the proposed use," "a statement indicating the effect of the proposed uses, if any, on State and local government interests and the regional economy," and "a statement of the expected length of time needed for the withdrawal." 43 U.S.C. § 1714(c)(2).

34. The Secretary of the Interior may waive the public notice and Congressional notification requirements when the Secretary determines "that an emergency situation exists and that extraordinary measures must be taken to preserve values that would otherwise be lost" such that land may immediately be withdrawn. 43 U.S.C. § 1714(e). An emergency withdrawal may be made for no more than a three-year period. *Id.*

35. In its own implementing regulations, Interior has explained that a "resource value" includes "watershed, power, scenic, wilderness, clean air or recreational values," but does not include "military or other governmental activities requiring land sites only as an incidental means

to achieving an end not related primarily to the preservation, conservation, enhancement or development of natural resources or resource values indigenous to or associated with a particular land area." 43 C.F.R. § 2300.0-5(g)(2).

36. Even under the emergency withdrawal provision, Interior must provide a report on the effects of the withdrawal to the relevant Congressional committees within three months of notice of the withdrawal. 43 U.S.C. § 1714(c)(2).

**II. National Defense Areas.**

37. Under the Posse Comitatus Act, 18 U.S.C. § 1385, it is unlawful to "willfully use[] any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws."

38. "The purpose of this statute is to prevent use of the federal army to aid civil authorities in the enforcement of civilian laws." *Gilbert v. United States*, 165 F.3d 470, 472 (6th Cir. 1999); *see also Applewhite v. U.S. Air Force,* 995 F.2d 997, 1001 (10th Cir. 1993) ("The Posse Comitatus Act is clearly designed to restrict military involvement in civilian law enforcement.").

39. However, the military's ability to engage in law enforcement functions is broader when those functions are performed on or in defense of a military facility or installation. *See United States v. Banks*, 539 F.2d 14, 16 (9th Cir. 1976) ("the Act does not prohibit military personnel from acting upon on-base violations committed by civilians"); *see also United States v. Dreyer*, 804 F.3d 1266, 1276 (9th Cir. 2015); *Applewhite*, 995 F.2d at 1001.

40. To that end, 10 U.S.C. § 2672(a) provides that "[t]he Secretary of Defense shall protect the buildings, grounds, and property that are under the jurisdiction, custody, or control of the Department of Defense and the persons on that property." To do so, federal personnel may enforce Federal laws, including by making arrests "without a warrant for any offense against the United States committed in the presence of the officer or agent" and "for any felony cognizable

under the laws of the United States if the officer or agent has reasonable grounds to believe that the person to be arrested has committed or is committing a felony." 10 U.S.C. § 2672(c)(3)(A)–(B).

41. Various statutory provisions also criminalize unauthorized entry into a DoD facility. *See, e.g.*, 18 U.S.C. § 1382; 50 U.S.C. § 797.

42. Accordingly, DoD guidance provides that military personnel may conduct arrests as well as "actions related to a commander's inherent authority to maintain law and order on a DoD installation or facility," which DoD has interpreted as exceptions to the general "restriction on DoD participation in civilian law enforcement activities i[n] the Posse Comitatus Act"[4]; *see also* Whether the Posse Comitatus Act Prohibits Military Personnel from Making Arrests Outside, but Within the "Immediate Vicinity" of, a National Defense Area for Crimes Committed Within that National Defense Area, 50 Op. O.L.C. (Aug. 14, 2026) (slip op. at 4-6).[5]

43. A "national defense area" is a term created by DoD to refer to military control over military installations and territory, but it appears nowhere in statute or regulation. DoD uses that term in internal guidance to describe the agency's ad-hoc practice of responding to specific emergencies on Federal, State, or private land by exercising temporary military control over a designated geographic area. The term originates in DoD guidance from the 1960s describing the agency's policy of responding to potential nuclear accident sites. *See, e.g.*, DoD, No. 5230.16, *Nuclear Accident and Incident Public Affairs Guidance*, § E.2.1.20 (Dec. 20, 1993) (reissuing guidance from 1967).

---

4 DoD, No. 3025.21, *Defense Support of Civilian Law Enforcement Agencies* 16 (Feb. 8, 2019), https://perma.cc/5384-X2XT.

5 https://perma.cc/NVM5-NXNQ.

44. The DoD instruction manual regarding "Security of DoD Installations and Resources and the DoD Physical Security Review Board" explains that DoD commanders have authority over "*temporarily established* 'National Defense Areas,' in emergency situations, such as accident sites involving Federal equipment or personnel on official business." DoD, No. 5200.08, § 3.2.1 (Nov. 20, 2015) (emphasis added).

45. Similarly, Army Regulation 190-13, "The Army Physical Security Program," defines a "national defense area" as a "restricted area" established "to protect classified defense information and DOD equipment or material." Sec. 6-7(a). That internal guidance claims the Army is permitted to temporarily establish defense areas on non-federal land when necessitated by an emergency event, and offers "nuclear and chemical event sites and aircraft crash sites" as examples of circumstances warranting the temporary creation of an "national defense area." *Id.*; *see also* Captain Thomas J. Alford, *Close to Home: Responding to Fatal Aircraft Accidents on Private Land*, 38 Reporter, no. 1 (2011) at 9, 11[6]; *Zbitnoff v. James*, No. 5:14-cv-132, 2016 WL 4251047, at *15 (D. Vt. Aug. 10, 2016) ("The crash of any military jet would likely result in the declaration of a [defense area] so as to provide control and safety measures over the crash site.").

46. DoD's use of "national defense areas" has historically been temporary and tied to a discrete and time-limited emergency event. One article explains that the designation "has no basis for existing after the classified material has been removed."[7] Further, a military scholar has explained that "DoD's practice [has generally been to invoke] the [national defense area] principle under relatively uncontroversial circumstances, free of the complicating presence of large sums of money, potential abridgement of free expression, or other contentious matters."[8]

---

6 https://perma.cc/P3DS-54ZS.

7 Steve H. Walker, *National Defense Area*, Army Law (Oct. 1981), at 13.

8 Captain John S. Fredland, *Building a Better Cybersecurity Act: Empowering the Executive Branch Against Cybersecurity Emergencies*, 206 Mil. L. Rev. 1, 27 (2010).

47. The military has used "national defense areas" to temporarily prevent third parties from accessing classified material and to protect civilians from harm, such as by cordoning off a limited area immediately following a military helicopter crash.[9]

48. For example, on September 14, 1997, an F-117A Nighthawk jet crashed during an air show in Baltimore County, Maryland. Following the crash, military officials declared a national defense area, which DoD described as a "routine" practice following military crashes.[10] The defense area was terminated approximately a week after the crash. *Id*.

49. No DoD regulations or guidance provides for the use of "national defense areas" as a tool to extend military jurisdiction over large swaths of public land for a period of years for the purpose of allowing the military to conduct activities that would otherwise be prohibited by the Posse Comitatus Act.

**III. The Army Clause.**

50. Article I, Section 8, Clause 12 of the Constitution provides that Congress shall have the power "[t]o raise and support Armies," but that any "Appropriation of Money to that Use shall [not] be for a longer Term than two Years."

51. The Supreme Court has explained that this "restriction" was designed to "ensure[] that, for the army, Congress cannot 'vest in the Executive department . . . permanent funds' and must instead 'once at least in every two years . . . deliberate upon the propriety of keeping a military force on foot,' 'come to a new resolution on the point,' and 'declare their sense of the matter, by a formal vote in the face of their constituents.'" *Consumer Fin. Prot. Bureau v. Cmty.*

---

[9] Army Law, *supra* note 7, at 8.

[10] Peter Hermann, *Stealth jet crashes at air show Fighter hits house in Bowleys Quarters; neighbors evacuated; Pilot 'really sorry'; Witnesses report seeing F-117A break up in midair*, Balt. Sun (last updated Oct. 22, 2018), https://www.baltimoresun.com/1997/09/15/stealth-jet-crashes-at-air-show-fighter-hits-house-in-bowleys-quarters-neighbors-evacuated-pilot-really-sorry-witnesses-report-seeing-f-117a-break-up-in-midair/.

*Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 436-37 (2024) (quoting *The Federalist No. 26*, p. 143 (E. Scott ed. 1898)).

## FACTUAL ALLEGATIONS

### I. The Trump Administration's Actions to Further Militarize the Southern Border.

52. Immediately upon returning to office, President Trump issued orders to implement his administration's policy of militarizing the southern border, criminalizing access to traditionally public lands, and permitting military personnel to perform the type of law enforcement functions that are otherwise legally prohibited.

53. First, on January 20, 2025, President Trump issued Proclamation 10886, "Declaring a National Emergency at the Southern Border of the United States." 90 Fed. Reg. 8,327 (Jan. 20, 2025). Therein, and pursuant to the National Emergencies Act, 50 U.S.C § 1601, *et seq*., President Trump directed that DoD "obtain[ ] complete operational control of the southern border of the United States" "to ensure that the illegal entry of aliens into the United States via the southern border be immediately and entirely stopped." 90 Fed. Reg. at 8,326-27.

54. Among other things, the Proclamation directed that DoD deploy personnel "to support the activities of the Secretary of Homeland Security in obtaining complete operational control of the southern border of the United States," and that DoD "prioritize the impedance and denial of the unauthorized physical entry of aliens across the southern border of the United States." 90 Fed. Reg. 8,328.

55. Second, that same day, President Trump issued Executive Order 14167, "Clarifying the Military's Role in Protecting the Territorial Integrity of the United States." 90 Fed. Reg. 8,613 (Jan. 30, 2025). Citing the purported dangers of "[u]nchecked unlawful mass migration and the unimpeded flow of opiates across our borders," President Trump directed DoD to formulate a "mission to seal the borders and maintain the sovereignty, territorial integrity, and security of the

United States by repelling forms of invasion including unlawful mass migration, narcotics trafficking, human smuggling and trafficking, and other criminal activities." *Id.*

56. Third, on April 11, 2025, President Trump issued National Security Presidential Memorandum-4 ("NSPM-4") to provide additional directives to DoD in furtherance of E.O. 14167.[11] To further DoD's mission of "sealing the United States southern border from unlawful entry," the Memorandum directs DoD to accept jurisdiction over Federal lands to "enable military activities . . . to occur on a military installation under the jurisdiction of [DoD] and for the designation of such Federal lands as National Defense Areas." *Id.*

57. Accordingly, the Memorandum orders that:

> In accordance with Proclamation 10886 . . . 43 U.S.C. 155 is hereby invoked and the Secretary of the Interior may make withdrawals, reservations, and restrictions of public lands to provide for the utilization of public lands by the Department of Defense to address the emergency at the southern border, without regard to any limitation on withdrawals otherwise applicable under the terms of the Engle Act, 43 U.S.C. 155-158.

*Id.* § 1(b).

58. As DoD explained in an accompanying press release, "[o]nce the Army accepts jurisdiction of that land, it will become part of a national defense area — a specified piece of federal land over which DOD maintains administrative authority and jurisdiction and is permitted to establish and enforce a controlled perimeter and access."[12] According to DoD, Army forces deployed along the southern border are "governed by the same rules as when they are defending any other military installation, such as apprehending trespassers and passing them to appropriate civilian or federal law enforcement officials." *Id.*

---

[11] Memorandum on the Military Mission for Sealing the Southern Border of the United States and Repelling Invasions, 2025 Daily Comp. Pres. Doc. 471 (Apr. 11, 2025), https://perma.cc/74FU-NC8J.

[12] C. Todd Lopez, *Interagency Land Agreement Strengthens Military Border Mission*, DoD News, at 2 (Apr. 16, 2025), https://perma.cc/T2BV-XUKB.

## II. The Department of Interior Transferred Thousands of Acres of Public Land to the Department of Defense.

59. Upon information and belief, in April 2025, DoD applied to Interior seeking the transfer to DoD of approximately 110,000 acres of public land in New Mexico.

60. On April 15, 2025, Interior approved DoD's application and transferred almost 110,000 acres of public land in New Mexico to DoD. *See Public Land Order No. 7963: National Defense Operating Area Withdrawal, Dona Ana, Luna, and Hidalgo Counties, NM*, 90 Fed. Reg. 16,698 (Apr. 21, 2025).

61. Interior cited as authority "section 204 of the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. 1714," and specifically "subsection 204(e) of that Act," under which, and without offering any further explanation, Interior stated that it had "determined that an emergency situation exists and that extraordinary measures must be taken to preserve values that would otherwise be lost." *Id*.

62. In its transmission to Congress, Interior provided the following map of the withdrawn land (falling within the lime green lines):



https://perma.cc/3FNN-WZYW.

63. DoD describes the transferred land as "approximately 170 miles long," "travers[ing] non-contiguously from the Arizona and New Mexico state line eastbound to the New Mexico and Texas state line," and "rang[ing] from 60 feet to one mile wide."[13]

64. Although Public Land Order No. 7963 stated that Interior was withdrawing "approximately 109,651 acres" of public land, Interior later issued a correction specifying the amount of withdrawn land was actually "110,967 acres." 91 Fed. Reg. 13,861, 13,862 (March 23, 2026). And even that number may not be correct; an independent analysis of the size of the withdrawn land estimated it totaled more than 400 square miles (approximately 256,000 acres), significantly more than the size publicly revealed by Interior.[14]

65. Upon information and belief, while Public Land Order No. 7963 is valid only for a period of three years, DoD intends to take steps to extend the term of the transfer, potentially up to the maximum 20-year term provided for under FLPMA.

66. Although Interior's accompanying press release stated that the transfer would not only "enabl[e] the Department of the Army to support U.S. Border Patrol operations in securing the border and preventing illegal immigration" but also "safeguard sensitive natural and cultural resources,"[15] the Public Land Order itself offered by way of rationale only that the withdrawal was to facilitate "use [of the land] by the Department of the Army for border security purposes." 90 Fed. Reg. 16,698.

---

[13] U.S. N. Command, *Operation Ardent Vanguard*, https://perma.cc/S7UU-8H2J.

[14] Patrick Lohmann, *By the #s: NM's new military-controlled border zone is not a '60-foot buffer.' It's 400 square miles*, Source NM (May 2, 2025, at 12:30 PM), https://perma.cc/7R95-S3HT.

[15] Press Release, U.S. Dep't of Interior, *Secretary of the Interior Transfers Federal Lands Along New Mexico Border to the Army to Protect Resources* (Apr. 15, 2025), https://perma.cc/JG43-3KGN.

67. Upon information and belief, Interior has never submitted to Congress the report required by FLPMA, 43 U.S.C. § 1714(c)(2), (e).

68. Since the establishment of the New Mexico National Defense Area in the spring of 2025, the DoD has pursued similar land transfers in Texas, Arizona, and California, establishing DoD control over wide swaths of the U.S-Mexico border.

**III. The Department of Defense Created a National Defense Area in New Mexico.**

69. Immediately following the transfer from Interior, on April 18, 2025, then-Secretary of the Army Dan Driscoll issued General Order 2025-10, "Assignment of New Mexico Withdrawn Lands to the United States Army Garrison Fort Huachuca for Use as National Defense Areas."[16]

70. The Order provides that "[e]xercise of all necessary authority, direction, and command and control over these lands will be in accordance with Army Regulation 600–20." *Id.*

71. The following map depicts the relative locations of the New Mexico "national defense areas" (the "NDA") (#1 in the below map) and Fort Huachuca:

[16] Headquarters, U.S. Dep't of the Army, Gen. Order No. 2025-10 (Apr. 18, 2025), https://perma.cc/JBD5-FUTC.




Source: GAO analysis of Department of Defense (DOD) information (text); and Map Resources (map). | GAO-26-108437

https://perma.cc/3DBM-WCR4.

72. Fort Huachuca is located in Arizona, more than 100 miles from the western terminus of the New Mexico NDA.

73. That same day, the Senior Commander of Fort Huachuca issued a memorandum (ATZS-CG (600-20)) deeming the transferred lands "restricted" and "controlled" pursuant to Regulation 190-13 of the Army Physical Security program.[17] Accordingly, only individuals who obtain permission from the Army may access the NDA, and only on the terms and for the duration set out by the Army; entry is otherwise a criminal offense. Army Regulation 190-13, at 94.

74. Following the transfer, DoD explained that "federal troops participating in [the southern border operation] and who are operating on the [New Mexico NDA], can temporarily detain trespassers until an appropriate law enforcement entity can assume custody," and can

[17] Memorandum for Record from Major Gen. Richard T. Appelhans, Senior Commander, U.S. Army Fort Huachuca (Apr. 18, 2025), https://perma.cc/F8F2-LVMG.

"conduct cursory searches of trespassers to ensure the safety of U.S. service members and DOD property, [and] conduct crowd control measures as necessary."[18]

75. DoD Secretary Hegseth was clear about DoD's intentions with respect to the transferred land: "This is Department of Defense property . . . . Any illegal [attempt] to enter that zone is entering a military base — a federally protected area. You will be detained. You will be interdicted by U.S. troops and border patrol working together." *Id*.

76. The Commander of the U.S. Northern Command echoed these statements, referring to the "enhanced authorities" available to the military to detain "those who illegally trespass in the New Mexico National Defense Area."[19]

77. Despite DoD's pronouncements that the transferred land in New Mexico is now a military installation by virtue of being administered by Fort Huachuca, that distinction is far from clear on the ground. The transferred land was formerly public land and accordingly looks indistinguishable from surrounding areas.

78. The only indicator the land is now under DoD jurisdiction is typically relatively small signage, measuring about 12 by 18 inches, with text in English and Spanish:

[18] C. Todd Lopez, *At Southern Border, Defense Secretary Visits Newly Created National Defense Area*, DoD News (Apr. 25, 2025), https://perma.cc/SP3J-NFP4.

[19] Press Release, U.S. N. Command, *Enhanced Authorities in the New Mexico National Defense Area* (Apr. 21, 2025), https://perma.cc/YAP6-X2GX.




Patrick Lohmann, *Confusion reigns in New Mexico's militarized border zone*, Source NM (May. 30, 2025, at 11:59 AM), https://perma.cc/E3JR-SSK9.

79. This confusion is amplified by the fact that the New Mexico NDA includes parts of New Mexico State Road 9, which is a two-lane route connecting small towns like Animas and Hachita to the rest of New Mexico, such that travelers frequently (and unknowingly) travel through the NDA.[20]

80. Courts have found prosecutions of individuals alleged to have trespassed within the NDA suspect based on the government's inability to demonstrate that alleged trespassers were within the boundaries of the NDA at the time of their arrests. *See United States v. Escobedo-Molina*, 790 F. Supp. 3d 1283, 1295 (D.N.M. 2025) ("The Government must prove, for example,

---

[20] Todd Miller, *"None of These People Are from the Border": A Dispatch from the National Defense Area in New Mexico*, The Border Chronical (May 15, 2025), https://perma.cc/N7BZ-ZHC7.

that the Defendant entered onto land that is part of the [NDA]. . . which in turn requires proof that the particular parcel of land is contained within the noncontiguous boundaries of the [NDA]. "[I]n the only case thus far to proceed to trial on these charges in this District, the Government *conceded that it had no evidence as to essential elements of the crimes*." (emphasis in original)). *Id.*

81. That uncertainty has not prevented the U.S. Department of Justice ("DOJ") from continuing to press trespassing charges pursuant to 18 U.S.C. § 1382 and 50 U.S.C. § 797. Upon information and belief, since DoD first established the New Mexico NDA, DOJ has charged approximately 1,800 individuals with NDA-related crimes.

82. Individuals who, prior to establishment of the New Mexico NDA, would only have been charged with immigration-related illegal entry charges now routinely face additional felony trespassing charges brought under 18 U.S.C. § 1382 and 50 U.S.C. § 797.

83. One judge in this District heard over 400 trespassing cases in one month. *See Escobedo-Molina,* 790 F. Supp. 3d at 1287 (noting the "enormous series" of cases arising from the "new prosecutorial strategy against individuals who enter the United States unlawfully at the southern border" based on NDA trespassing).

84. Many prosecutions have failed based on findings that the Department of Justice has been unable to establish probable cause because the individual who was charged was unaware they were within the NDA. *See, e.g.*, *United States v. Lopez-Gonzalez*, 782 F. Supp. 3d 1062, 1073 (D.N.M. 2025).

## IV. Congress Funded the Militarization of the Southern Border for a Four-Year Period in Violation of the Army Clause; Those Funds Are Being Used by the Army to Create and Maintain the New Mexico National Defense Area.

85. In the normal course, DoD activities are funded through a two-step process. First, the annual National Defense Authorization Act ("NDAA") "provides authorization of appropriations for [DoD] . . . [and] establishes defense policies and restrictions, and addresses

organizational administrative matters related to [DoD]."[21] "The bill itself does not provide actual budget authority, which occurs in the annual appropriations bills that follow a similar cycle to the NDAA, but rather authorizes programs, projects, and policies to be carried out with Congressionally appropriated funds."[22]

86. Second, DoD appropriations are provided through the annual budgetary process.[23]

87. In an exception to the normal process, Congress included mandatory DoD funding in the July 2025 OBBBA.

88. The OBBBA, Pub. L. 119-21, 139 Stat. 72 (July 4, 2025), generally provides for Defense appropriations through September 30, 2029. *See generally id.* title II, 139 Stat. at 112. In particular, Section 20011 provides that:

> In addition to amounts otherwise available, there are appropriated to the Secretary of Defense for fiscal year 2025, out of any money in the Treasury not otherwise appropriated, to remain available until September 30, 2029, $1,000,000,000 for the deployment of military personnel in support of border operations, operations and maintenance activities in support of border operations, counter-narcotics and counter-transnational criminal organization mission support, *the operation of national defense areas and construction in national defense areas*, and the temporary detention of migrants on Department of Defense installations, in accordance with chapter 15 of title 10, United States Code.

*Id.* § 20011, 139 Stat. at 125 (emphasis added).

89. DoD has since furnished information on how those funds have been apportioned and obligated by the agency. In a May 4, 2026, transmittal to Congress, DoD provided a spending

[21] Valerie Heisthusen & Daniel M. Gettiner, Cong. Rsch. Serv., *Defense Primer: The NDAA Process* (Dec. 4, 2025), https://perma.cc/U79W-74RV.

[22] Ctr. for Arms Control & Non-Proliferation, *The NDAA process, explained*, https://perma.cc/Q9YC-GMSB.

[23] James V. Saturno and Megan S. Lynch, Cong. Rsch. Serv., 1F0514, *Defense Primer: Defense Appropriations Process* (Feb. 11, 2026), https://perma.cc/B7NL-SKCY.

plan for the OBBBA funds and indicated that of the $1 billion appropriated for border security initiatives, DoD intended to spend $810 million on the operation of "national defense areas."[24]

90. DoD is currently using those funds to pay for expenses including "[d]eploying, training, equipping, and demobilizing [DoD] personnel supporting NDA operations," "[c]ontinuous employment of military vehicles, aircraft, sensors, and C2 equipment to maintain a constant state of readiness in the NDAs," "[p]reservation of necessary military infrastructure, from temporary facilities to observation outposts," "[e]nhanced reconnaissance at NDAs in the vicinity of high-traffic border crossing points and official points of entry," and "NDA demarcation and advanced monitoring technology." FY26 Mandatory Funding Allocation, *supra* note 24, at 81-82. DoD also explained that the agency plans to expend $84.8 million to support Army personnel, and $192.6 million to support Army operations. *Id.* at 82.

91. Upon information and belief, approximately $300 million of the roughly $800 million of OBBBA funds DoD intended for operation and maintenance of "national defense areas" remains unobligated.

92. A recent report from the Government Accountability Office ("GAO") sheds further light on DoD's past and planned spending from the OBBBA appropriation.[25]

93. The report indicated that as of March 31, 2026, DoD "had obligated $472 million of [the $1 billion in OBBBA] funds." *Id*. at 12. The vast majority of Fiscal Year 2026 funds are intended to be obligated towards "national defense areas." *Id*. at 14; *see also id*. at 28 (summary of expenditures from DoD expenditure obligation reports to Congress).

---

[24] Off. of the Under Sec' of War (Comptroller), U.S. Dep't of War, FY2026 Mandatory Funding Allocation (2026), https://perma.cc/E4SP-R4MT.

[25] *See* U.S. Gov't Accountability Off. GAO-26-108437 *Southern Border Security; DOD Used Multiple Strategies to Fund Operations* (2026), https://perma.cc/BH5G-ME7U.

94. The report described "national defense area" costs as including "land management and development of the [areas]," "establish[ing] and enforc[ing] a controlled perimeter," and "establishing and marking [defense area] boundaries with signs, fences, and buoys, among other things . . . ." *Id.* at 15-16.

95. GAO also clarified that "for each [NDA], the military service that administers the existing installation will be responsible for administering the NDA and for paying the costs associated with it." *Id. at* 16. Most southern border expenditures are for Army personnel and operations, the service branch responsible for administering the New Mexico NDA. *Id*. at 22-23.

96. "Among the amounts that the Army obligated from its operation and maintenance appropriation, the largest categories of cost were for training and operation of units ($631 million) and activities essential to land forces readiness ($375 million). Among the amounts that the Army obligated from its military personnel appropriation ($471 million), the largest categories were for basic pay for service members ($252 million) and basic allowance for housing ($70 million)." *Id*. at 23.

## INJURIES TO PLAINTIFFS

97. The creation and operation of the New Mexico NDA harms Plaintiffs in several ways. Inability to access what was formerly public land in New Mexico has injured, and continues to injure, Plaintiffs New Mexico Wildlife Federation and its members, Plaintiff Battalion Search and Rescue, and Plaintiff Southern Border Communities Coalition's members.

### I. New Mexico Wildlife Federation's Members Cannot Access Public Lands to Recreate.

98. NMWF's membership encompasses a broad constituency of outdoor enthusiasts who care deeply about wildlife, healthy habitats, public lands and waters, and access to the outdoors. Those members view hunting and fishing not simply as recreational activities, but as

traditions connected to healthy ecosystems, responsible wildlife management, and stewardship of New Mexico's public lands.

99. NMWF's members include hunters, fishermen, and outdoor enthusiasts whose access to public land now deemed part of the New Mexico NDA has been prevented and frustrated such that they cannot engage in outdoor experiences in the places and manner they did prior to creation of the NDA.

100. NMWF's members' hunting access has been particularly impaired.

101. The operation of the NDA has restricted hunting and fishing access for NMWF members. NMWF members often hunt for Coues whitetail deer, a species that is only found in Mexico, New Mexico and Arizona. These deer are often found within the NDA. But since the public can no longer access the land that has now been deemed part of the NDA, NMWF members' ability to engage in successful hunts has been disrupted.

102. The NDA covers a substantial portion of New Mexico's existing game management units ("GMUs") where the State issues specific big game hunting tags (species-specific hunting permits) for species including Coues whitetail deer, mule deer, javelina, oryx, ibex, and barbary sheep. Members who receive tags for GMUs 19 and 25-31 will receive valid tags for GMUs that include portions of the NDA, and thus are not accessible like other GMUs across the State.

103. For example, long-time NMWF member Ray Trejo frequently hunted quail and other species on land that is now part of the NDA, and prior to April 2025 spent many weeks a year pursuing quail in the land now part of the NDA. He also frequently used the area for hiking, bird watching, and hunting javelina.

104. Other NMWF members have also been prevented from accessing NDA land for hunting and recreational purposes.

105. In addition, because of poor mapping and signage, in many places even NMWF members who have spent their entire lives in the area surrounding the NDA are unable to determine whether they are on military land, which causes a chilling effect on NMWF members' willingness to recreate anywhere in the vicinity of the NDA.

106. While some members may be able to obtain a special access pass from the Army to hunt on the NDA, that process requires members to complete an access badge application, pass a background check, and provide personal information to the Army. That application process poses privacy concerns for NMWF's members.

107. Further, members must travel out of state to Fort Huachuca in Arizona to obtain the pass, which imposes a further burden that prevents NMWF's members from accessing NDA land for recreation. And NMWF's Hispanic members are understandably worried about travelling to a military base to undergo security screening given the administration's increased aggressive and violent immigration enforcement actions.[26]

108. NMWF itself is harmed by the operation of the NDA. Every day, NMWF monitors and assesses public land and water access issues, including by attending county commission meetings to advocate for public access to these resources, reporting instances of unlawfully denied entry to public land, and monitoring efforts by private landowners to block public access.

109. NMWF has historically provided its members with the location of hunting sites by GMU. NMWF can no longer provide accurate information because it cannot ascertain the opaque borders of the New Mexico NDA. Accordingly, NMWF risks sharing the location of hunting sites

---

[26] *See* Jazmine Ulloa, *A Quiet ICE Surge That Unfolded 'Everywhere All at Once' This Summer*, N.Y. Times (Sept. 25, 2026), https://perma.cc/2VF8-4KTJ ("Federal agents appeared in nearly every corner of daily life, carrying out operations at hospitals and airports, outside suburban schools and along rural construction sites and truck stops. They fanned out from coastal cities in Maine to desert towns in Arizona, across the open plains of Wyoming and down through the southern borderlands.").

that may appear public, but that are actually deemed part of the NDA by DoD, and thus putting its members in dangerous situations or legal jeopardy.

## II. The New Mexico National Defense Area Prevents Battalion Search and Rescue from Fulfilling its Humanitarian Mission.

110. BSAR's mission is to search for missing migrants who have disappeared in remote areas along the American southwest border. The work of the organization is critical to ensuring that people continue to search for, collect, and investigate human remains in the area.

111. BSAR specifically works in Southern Arizona, Doña Ana County, New Mexico, and the desert corridor west of El Paso, Texas.

112. BSAR volunteers walk the desert terrain searching for human remains. On one shift, BSR volunteers found three separate sites of human remains in six hours.

113. BSAR has discovered and documented over 40 human remains sites in Doña Ana County, New Mexico, and more than 100 sites across Arizona and New Mexico more broadly.

114. Locating human remains and personal effects left behind allows authorities to identify the individual. Every unrecovered bone diminishes the chance for identification, forensic examination, and dignity for the deceased and their families.

115. BSAR's work is time sensitive. The climate of the desert rapidly destroys clothing, identification documents, phones, and other evidence. The heat of the desert can lead to human skeletonization in a matter of weeks. Animals in the area may quickly reach the deceased and reveal their bones within twenty-four hours of death.

116. The creation and maintenance of the New Mexico NDA significantly impairs BSAR's execution of its mission.

117. BSAR's historical data indicates 37 recorded deaths within the boundary of what is now the New Mexico NDA; the vast majority occurred within the last five years. Prior to April 2025, BSAR had routinely searched in and around the land that is now part of the NDA to attempt

to locate remains in that area. For example, BSAR volunteers found deceased persons in areas that are now within the NDA, such as around New Mexico State Road 9, where Border Patrol personnel conduct patrols, and then later found skeletal remains in the same area.

118. Based on experience, BSAR believes there is a significant possibility that unrecovered human remains are currently within the NDA, and BSAR would search the land within the NDA if permitted to do so. BSAR is unaware of any current systematic government effort to search the NDA for human remains in the absence of the organization's work.

119. Aside from direct access, the creation and maintenance of the NDA has impacted BSAR's efforts to work in the surrounding areas. For example, Border Patrol agents once incorrectly claimed the organization's volunteers were within the NDA; those volunteers have avoided returning to the same area even though it is not within the NDA according to DoD's own map.

120. In sum, creation and operation of the NDA prevents BSAR from conducting its critical work. As a result, deaths will be undercounted, and the deceased will remain unidentified. The very purpose of the organization's work is inhibited by the New Mexico NDA.

## III. The National Defense Area Prevents Southern Border Communities Coalition's Member Organizations from Providing Services Around the State.

121. Plaintiff SBCC's member organizations have also been harmed by creation and operation of the New Mexico NDA.

122. For example, one SBCC member organization is a statewide network committed to creating power for multigenerational, LGBTQ+, and mixed status families. The organization conducts training and leadership development and develops and implements organizing and advocacy infrastructure to support policy change.

123. The organization's staff members have been prevented from travelling through the NDA area for business or recreation, particularly with youth members of the organization who come from mixed status families.

124. Further, several of the organization's members come from mixed-status families and had traditionally observed Catholic traditions such as the Feast of Christ the King Mount Cristo Rey Pilgrimage, in which "up to 10,000 visitors" walk a "long, winding mountainside trail in New Mexico to a shrine of Christ the King."[27] Those members no longer participate since the NDA was established.

125. One of the organization's staffers unknowingly traveled through the NDA east of Sunland Park, NM, given the lack of clear signage, and was only alerted to being in the NDA due to the presence of a military vehicle and helicopters. The organization's ability to travel to that portion of the State is now curtailed given the operation of the NDA.

126. The organization also serves undocumented and mixed-status families, populations which have been impacted by the criminal trespassing prosecutions facilitated by operation of the NDA.

127. Another SBCC member, NM Comunidades en Acción y de Fé ("NM Communities in Action and Faith") ("NM CAFé"), has also been harmed by the creation and operation of the New Mexico NDA.

128. NM CAFé is a network of diverse religious institutions and community organizations across Southern New Mexico committed to building power for New Mexicans who have been directly impacted by systems of injustice.

---

[27] Julian Resendiz, *Thousands climb Mount Cristo Rey on Good Friday*, Border Rep. (Apr. 3, 2026), https://perma.cc/N9HD-PM4T.

129. NM CAFé's members are unwilling to travel near the NDA to work, meet, or provide services because of fear of trespassing. Those members have no way to discern the borders of the restricted area under the control of the military.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Administrative Procedure Act

**5 U.S.C. § 706(2)A)**
**Agency Action Not in Accordance with Law—Land Transfer in Violation of FLPMA**
***By All Plaintiffs Against Defendants Interior and Burgum***

130. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

131. The Administrative Procedure Act authorizes judicial review of final agency action. 5 U.S.C. § 704.

132. Final agency actions are those (1) that "mark the 'consummation' of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).

133. Secretary Burgum's issuance of Public Land Order 7963 marks the consummation of Interior's decisionmaking process to transfer public land in New Mexico to DoD. Further, the Order is one from which legal consequences flow, as the emergency transfer circumvented FLPMA's required withdrawal procedures and gave DoD immediate jurisdiction over the transferred land.

134. The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

135. Under 43 U.S.C. § 1714(e), the Secretary of the Interior may execute an immediate withdrawal of land only if the Secretary determines "that an emergency situation exists and that extraordinary measures must be taken to preserve values that would otherwise be lost."

136. The values referred to in FLPMA do not encompass militarizing immigration enforcement. Instead, that term is defined to mean "scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8).

137. Interior's transfer of Federal land in New Mexico to DoD via Public Land Order No. 7963 for the express purpose of facilitating the military's participation in immigration enforcement, rather than to protect the environmental values within the meaning of FLPMA, is contrary to the requirements of 43 U.S.C. § 1714(e).

138. Further, Interior failed to submit the report to Congress required by 43 U.S.C. § 1714(e).

139. Public Land Order No. 7963 therefore violates FLPMA, is "not in accordance with law," 5 U.S.C. § 706(2)(A), and should be set aside.

**COUNT II**
**Violation of the Administrative Procedure Act**

**5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious Agency Action—Land Transfer**
***By All Plaintiffs Against Defendants Interior and Burgum***

140. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

141. For the reasons explained above, Public Land Order 7963 is a final agency action subject to this Court's review.

142. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A).

143. Interior and Secretary Burgum acted arbitrarily and capriciously in issuing Public Land Order No. 7963 because, among other things, they:

a. Failed to engage in reasoned decisionmaking or reasonably explain why the Public Land Order would further the purposes of FLPMA;

b. Failed to reasonably consider the potential environmental harm caused by increased military activity within the NDA;

c. Failed to consider alternatives short of transferring public land to DoD; and

d. Failed to consider the reliance interests of Plaintiffs and other members of the public, who reasonably expected that their access to public land would remain consistent with long-settled expectations and practice.

144. For these and other failings, Public Land Order No. 7963 is arbitrary and capricious, and should be set aside pursuant to 5 U.S.C. § 706(2)(A).

**COUNT III**
**Violation of the Administrative Procedure Act**

**5 U.S.C. § 706(2)(A), (C)**
**Agency Action Not in Accordance with Law and in Excess of Statutory Authority—Creation of National Defense Area**
***By All Plaintiffs Against the DoD Defendants***

145. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

146. The Administrative Procedure Act authorizes judicial review of final agency action. 5 U.S.C. § 704.

147. Final agency actions are those (1) that "mark the 'consummation' of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted).

148. Army General Order 2025-10 and Army Memorandum ATZS-CG (600-20) (together the "Army NDA orders") are individually and collectively final agency actions subject to the Court's review.

149. The Army NDA orders mark the consummation of DoD and the Army's decisionmaking process because they establish a "national defense area" in New Mexico covering the land transferred to DoD from Interior.

150. The Army NDA orders are also, independently and collectively, actions by which rights or obligations have been determined or from which legal consequences will flow because the orders create a militarized zone over formerly public land, the unauthorized entry into which imposes potential criminal legal consequences.

151. The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law" or that is "in excess of statutory jurisdiction, authority, or limitations, or short of a statutory right." 5 U.S.C. § 706(2)(c).

152. "An agency . . . literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (internal quotation marks and citation omitted).

153. No statutory provision authorizes the DoD Defendants to create a "national defense area," let alone one stretching for a term of at least three years that was created to enable the military to engage in otherwise-prohibited law enforcement actions. Indeed, the Army NDA orders are by their express terms not time-limited and ostensibly create a "national defense area" that will last beyond the term of Interior's transfer of land to DoD.

154. Moreover, given the expansive authority the DoD Defendants claim—the power to reclassify thousands of acres of public land as a military zone for purposes of permitting the military to engage in otherwise prohibited law enforcement—the DoD Defendants needed to point to a clear Congressional authorization for their actions, and failed to do so. The Army NDA orders therefore violate the major questions doctrine. *See Learning Resources, Inc. v. Trump*, 607 U.S. 229, 242 (2026).

155. The DoD Defendants have therefore acted contrary to law and/or in excess of statutory jurisdiction, authority or limitations in creating and operating the New Mexico NDA.

156. Accordingly, the Army NDA orders should be declared unlawful and set aside as not in accordance with law and/or in excess of the DoD Defendants' statutory authority.

**COUNT IV**
**Violation of the Administrative Procedure Act**

**5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious Agency Action—Creation of National Defense Area**
**By All Plaintiffs Against DoD Defendants**

157. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

158. The Administrative Procedure Act authorizes judicial review of final agency action. 5 U.S.C. § 704.

159. For the reasons explained above, the Army NDA orders are individually and collectively final agency actions subject to this Court's review.

160. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A). The Army NDA orders are arbitrary and capricious in several respects, including that:

a. The Army NDA orders conflict with laws, regulations, and constitutional provisions;

b. The Army NDA orders violate longstanding DoD policy, which provides that "national defense areas" are at most temporary measures used to respond to an emergency, *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954);

c. The Army NDA orders are substantively and procedurally unreasonable and arbitrary and capricious, because, among other things, the DoD Defendants failed to explain how creation of the New Mexico NDA was necessary for the protection of DoD grounds and property and because the NDA was created for the impermissible purpose of allowing the military to engage in civilian law enforcement;

d. The Army NDA orders reflect no consideration of reasonable alternatives, including less disruptive ways of fulfilling the President's orders in NSPM-4.

e. The Army NDA orders do not reflect any consideration of the Constitutional implications of imposing criminal penalties on unknowing trespassers on what was long public land.

161. Accordingly, the Army NDA orders are arbitrary and capricious and should be set aside pursuant to 5 U.S.C. § 706(2)(A).

**COUNT V**
**Violation of the Army Clause**

**U.S. Const. Art. I, Sec. 8, cl. 12**
**By All Plaintiffs Against DoD Defendants**

162. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

163. Article I, Section 8, Clause 12 of the United States Constitution provides that Congress shall have the power "[t]o raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years."

164. The OBBBA, Pub. L. 119-21, 139 Stat. 72 (July 4, 2025), generally provides for Defense appropriations through September 30, 2029. *See generally id.* title II, 139 Stat. at 112. Section 20011 in particular provides that funds may be used for "the operation of national defense areas and construction in national defense areas." *Id.* § 20011, 139 Stat. at 125.

165. As explained in its May 4, 2026 "complete" Reconciliation Spend Plan, DoD intends to spend approximately $810 million of the $1 billion in OBBBA border security funds on creation and maintenance of "national defense areas."

166. Approximately $300 million of that sum remains unobligated and unexpended.

167. As reported by the GAO, the largest expenditures of OBBBA funds have been for the training and operation of Army units, including pay and housing.

168. Those expenditures plainly fit within the category of funds used to "raise and support Armies," and are thus prohibited by the Army Clause if made from appropriations for longer than a two-year period, such as provided for in the OBBBA.

169. Further obligation or expenditure of OBBBA funds by the Army for maintenance or operation of the New Mexico NDA violates the Army Clause, and the Court should enjoin and/or stay any further unconstitutional agency action.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

A. Vacate and set aside Public Land Order No. 7963;

B. Vacate and set aside Army General Order 2025-10;

C. Vacate and set aside Army Memorandum ATZS-CG (600-20);

D. Declare the DoD Defendants' establishment of the New Mexico NDA contrary to law and excess of their statutory authorities;

E. Preliminarily and permanently enjoin Defendants, their offices, employees, and agents from taking any further action to create, implement, operate, or administer the New Mexico NDA;

F. Declare unlawful and enjoin the Army from obligating further funds appropriated via Pub. L. 119-21 (July 4, 2025) for the operation or maintenance of the New Mexico NDA;

G. Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements deemed appropriate; and

H. Grant such other relief as the Court deems necessary, just, and proper.

Date: October 8, 2026

Respectfully submitted,

PEIFER, HANSON, MULLINS & BAKER, P.A.
By: /s/ Mark T. Baker
Mark T. Baker
Post Office Box 25245
Albuquerque, NM 87125-5245
Telephone: (505) 247-4800
Facsimile: (505) 243-6458
Email: mbaker@peiferlaw.com

*Counsel for Plaintiffs*

*/s/ Gregory M. Cumming*
Gregory M. Cumming[+]
Lesley R. Farby[+]
Brian D. Netter[+]
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
gcumming@democracyforward.org
lfarby@democracyforward.org
bnetter@democracyforward.org

[+] Motion to appear pro hac vice pending